COUNTY OF· UNION, complainant,

*v.*

CHARLES A. HOPKINS et al., defendants.

[Decided January 3d, 1924.]

1. In an interpleader suit each of the interpleading parties is, as to his own claim, a party complainant and has the burden of establishing it by a preponderance of evidence.

2. The right to payment of a reward is contractual and unless and until there has been essentially a complete performance of all the material terms and conditions specified in the offer, there is no completed contract and no one is entitled to payment of the reward.

3. The statute (*P. L. 1903 ch. 50*) authorizing counties to offer rewards for the detection and apprehension of criminals in certain

cases is to be liberally construed; and so likewise is an offer of reward purporting to be made pursuant to and under the authority of that statute.

4. Except in accordance with the terms of that statute, counties have no power or authority to offer such a reward.

5. An offer by a county of reward "for information leading to the detection, apprehension and conviction" of certain criminals differs essentially from an offer of reward "for the detection and apprehension" of such criminals "payable after conviction.'

6. In the latter case such persons as essentially cause the detection and apprehension, whether by giving information to the county or otherwise, have completed a contract with the county and are entitled to payment after conviction, irrespective of whether they or other persons have been instrumental in causing the conviction.

7. In the former case there is no completed contract unless the detection, apprehension and conviction also are essentially caused by information given to the county and not otherwise; and if there be a completed contract it is with those persons only who have by giving information to the county essentially caused, or participated in causing, the specified result.

8. *Quære* is an offer in the first form valid under the statute aforesaid?

9. Acts done, or information given, prior to an offer of reward cannot constitute performance.

On final hearing.

*Mr. John K. English,* for the defendants Hopkins, Murphy and Schmidlin.

*Mr. Louis Messing, Jr.,* and *Mr. William R. Wilson,* for the defendants Grippo and Vardalis.

*Messrs. King & Vogl,* for the defendants Lee and Smith.

BUCHANAN, V. C.

Complainant, Union county, offered a reward for information leading to the arrest and conviction of certain criminals. After their arrest and conviction the reward was claimed by eight different persons, and the county thereupon filed a bill of interpleader, paid the money into court, and obtained decree of interpleader against the claimants. One of the claimants, Rubenstein, defaulted at the hearing, leaving it

to be determined which, if any, of the seven defendants above-named are entitled to the fund.

It appears that there had been in Union county a number of instances of the holding up of automobiles and trolley cars and the robbing of the occupants, and the board of freeholders on February 17th, 1921, adopted a resolution, the pertinent part of which is as follows:

"*Be it Resolved*, That this board offer a reward of $500 for any information leading to the detection, apprehension and conviction of each person found guilty of taking part or participating in any way in any of the said holdups committed in Union county in the past three months."

Thereupon the prosecutor of the pleas published the following advertisement:

"$500 REWARD.

Will be paid for information leading to the Arrest and Conviction of each of the three men guilty of Highway Robbery in connection with the recent Trolley Car and Automobile Hold-up cases which have happened in Union County since December 1st, 1920.

Information should be given direct to the undersigned or to John A. Galatian, Chief of Union County Detectives.

WALTER L. HETFIELD, JR.
Prosecutor of the Pleas."

The authority for the offering of the reward is to be found in *P. L. 1903 ch. 28 p. 50.*

"It shall and may be lawful for the boards of chosen freeholders of the several counties of this state, * * * to offer a reward not exceeding $500 for the detection and apprehension of any person guilty of murder, burglary, robbery, arson or other heinous crime in such county, such reward to be payable after conviction out of such funds of the county as may be applicable thereto."

The following facts are either admitted or uncontradicted (except where existence of dispute is stated). At the time of the publication of the offer of reward it was generally known that the series of highway robberies had been perpetrated by a band of three men, but the identity of these men was not known. Following the offer of reward another

holdup was attempted—an attack upon a trolley car was made by three men on the night of February 25th at Townley in Union county. The robbers caused the trolley to be thrown from the wire, and were discovered by the conductor as they approached the car. He gave the alarm to the passengers, and held the rear doors shut to prevent the entrance of the robbers during an exchange of a number of pistol shots between one of the bandits on the rear platform and the claimant Schmidlin (a deputy sheriff of Union county who happened to be a passenger on the car). The other two unsuccessfully tried to gain entrance at the front of the car, where the motorman was lying on the floor against the door, and all three shortly withdrew. Schmidlin had wounded one of them.

The trolley pole was replaced and the car was run to the water works or pumping station of the city of Elizabeth. Enroute, Schmidlin dropped off and went to the house of the claimant Murphy (who was also a deputy sheriff of Union county). On the arrival of the car at the pumping station the conductor, Lee, and the motorman, Smith (both claimants) telephoned the story of the holdup to the claimant Hopkins (who was chief of police of Union township), and also to the Elizabeth police station. Hopkins started out to look for the robbers.

Schmidlin, on his arrival at Murphy's house, told him of the occurrence. While Murphy was dressing, Schmidlin telephoned to the Elizabeth police station, and also, it is claimed, to chief of county detectives Galatian (this latter being however in dispute). Schmidlin and Murphy started out to hunt for the robbers and found the trial of blood left by the wounded robber and followed this across country until the traces disappeared at some hay stacks. After unsuccessful efforts to discover a further trail Schmidlin left, as did also the Elizabeth policemen (some of whom had been sent out by Sergeant Kirkman, on receiving the phone messages from Lee and Hopkins). Shortly before Schmidlin left, Hopkins had joined him and Murphy.

Hopkins and Murphy continued the search and found further slight traces of blood which led them in the direction of Kenilworth. At Kenilworth they called out the claimant Vardalis,· who was a police officer or chief of police of the borough of Kenilworth.

It was by this time about four-thirty A. M. Vardalis spoke of a house where he thought it possible the criminals might have hidden, and the trio went there, but without results. Vardalis knew that suspicion had been directed toward the three Krebs brothers (John, Charles and Anthony). He spoke of this to Murphy and Hopkins, and the three went to the Krebs' house which Vardalis pointed out. Murphy and Hopkins had theretofore had no knowledge of the Krebs or their house, or the suspicion against them.

There is a dispute as to whether Vardalis or the other two determined to go to the Krebs' house—but that is immaterial, I take it. There is also a dispute as to whether or not the three of them stopped at the house of the claimant Grippo on their way to the Krebs' house. Vardalis says they did, and that Grippo advised them to go to the Krebs' house and break in the door if necessary. But that also is immaterial, in my view—they were going to the Krebs' house anyway, and they did not have to break in the door.

There is also conflicting testimony as to the particular acts of the three after arriving at the Krebs' house, but it is indisputable that between six-thirty and seven A. M. they entered the house, found Charles Krebs inside, wounded, and feeling assured of the identity of the guilty parties, search was continued and the other two, John Krebs and his brother-in-law Martin Shannon, were discovered hidden in the cellar and captured. The three criminals were taken before Grippo (who was a justice of the peace) and "arraigned," then taken to Kenilworth police station, and at about eight-thirty A. M. County Detective Galatian came there and took them to the county jail, Galatian having been informed by Grippo that there had been another holdup and that officers had just gone to the Krebs' house.

Some time on the same day (February 26th) Galatian made criminal complaints against the three captives, in respect of each of the holdups, and on February 28th all three signed an allegation and entered a plea of guilty to each complaint, and were sentenced by the county judge on each plea.

Vardalis' knowledge that the Krebs brothers were suspected came from Grippo. The latter had made some investigations and learned that the three Krebs brothers were not working, yet from time to time had money for gambling. John Krebs was tall and Charles Krebs was short, and it was generally known that the offenses were being committed by three men, one of whom was tall and one of whom was short. It was also believed probable that these men lived in Kenilworth. Grippo had informed Vardalis of his investigations and conclusions before the offer of the reward. He also told County Detective Galatian, but there is a serious question as to whether he did this before or after the offer of the reward.

On these facts, what person or persons are entitled to payment of the reward?

The basis of the right to the payment of the reward is contractual. *Furman* v. *Parke, 21 N. J. Law 310;* and see *34 Cyc. 1730.* A different situation might be presented if the statute itself directed the payment of a reward, where the right might be deemed purely statutory instead of contractual. But that is not the case here, the statute merely authorizes the making of an offer of reward and the payment thereof when earned; it authorizes the contract by the county. The contract consists of the offer or promise by the county, on the one side, to make a certain payment for the doing of a certain thing, for which the consideration is, on the other side, not a promise to perform but the actual executed performance. If, and when, a party actually perform the doing of the specified thing, the contract is complete; the county is bound by its promise, and the party who has performed is entitled, by contract, to payment. On the other hand, unless and until there has been a performance of the

very thing specified, there is no contract, and no claimant is entitled to payment. *Cf. Furman* v. *Parke, supra.*

It is important therefore at the outset to see what the contract is—to determine the terms of the offer, or promise, in order to ascertain if there has been performance and, if so, by whom.

In the present case it will be observed that the language of the statute, and of the resolution, and of the advertisement, all differ. The language of the advertisement, however, need not concern us, since it is not the advertisement but the resolution which constitutes the offer or promise. The advertisement is a mere means of making the offer known.

The statute authorizes the county to offer a reward "for the *detection and apprehension,*" &c., "payable after conviction." The resolution offers reward "for *any information leading to the detection, apprehension and conviction,*" &c.

"Detection and apprehension," I think, must mean, both in the resolution and in the statute, detection and apprehension by the county. Public policy requires that criminals shall be punished for their crimes. The general purpose and design of the statute was to lessen the possibility of escape from punishment among those guilty of serious crimes. In view of our system of criminal procedure, therefore—so far as concerns "apprehension"—it could not have been the intent of the legislature to authorize rewards for mere capture by private individuals. If in such a case the criminal escaped before the county authorities obtained custody of him the purpose of the statute would not be served, and I think under the necessary interpretation of the statute the authorization of the payment of reward in such a case is excluded.

So also as to "detection"—at least in cases where the identity of the criminal is unknown. It could not have been the legislative intent to authorize payment of reward for the discovery of the criminal's identity merely by private individuals even though he is given into the county's custody. I think it must be deemed that the legislature contemplated that the county should obtain knowledge or information of

some sort sufficient, *prima facie* at least, to afford a rational ground for belief that the person in custody was the guilty man.

Of course it may be said that the statute, by providing that payment of the reward shall be made only after conviction, precludes payment for the detection of a criminal whose identity cannot be established or for the capture of a criminal who does not reach the county's hands. But that does not militate against what I have said, for, in the first place, under the form of expression of the statute, the conviction is not made in terms a part of the thing to be performed by way of earning the reward, but is made the date of maturity of payment and a condition precedent to such payment; it is not necessary that the claimant of the reward shall have caused the conviction, and in the second place we have to consider not only the question of what contsitutes performance but the question of who performs. To illustrate: Suppose a case, identity of criminal unknown, and reward offered in the precise terms of the statute. A and B, working independently and unknown to each other, ferret out facts showing that X is the guilty man.. A is successful in this a day or two before B, and succeeds in personally capturing X, but while A is taking X to the county authorities, X escapes. A delays until the next day giving the county the facts showing X to be the criminal. Meanwhile B has preceded him in this, and C has found X in hiding and caused his arrest by the county. X is tried and is convicted upon the evidence of A. The reward has been earned and payment is due, but to whom? Clearly, under what I have indicated to be the true interpretation of the statute, the performance has been by B and C. They and they only are entitled to the reward. A accomplished detection and capture, but not by the county—that was done by B and C. A accomplished conviction, but that was no part of the work to be done by way of earning the reward.

Since detection and apprehension, as used in the statute, mean detection and apprehension by the county, the same meaning must be attributed to them in the resolution or offer

*sub judice,* because the latter was made in pursuance and under the authority of the former, and there is nothing to indicate that any different meaning is to be attributed to them in the resolution.

That the resolution was made pursuant to the statute is shown by the fact that the statutory procedure and requisites were followed and performed, *i. e.,* the request of the prosecutor, and the approval of the county judge. That it was upon the statutory authority is clear, for there was no other power to act. By the great weight of authority a municipality has no implied power to offer reward, and certainly the necessary implication from the terms of this act itself, granting power to offer rewards in certain cases and under certain conditions, is that counties shall not have power to offer rewards except in such cases and under such conditions.

If the offer had been in the language of the statute—"for the detection [by the county] and apprehension" (by the county)—those persons would be entitled who jointly or severally substantially *caused* such detection and apprehension. Considering the design of the statute and the public policy involved, it would not have been contemplated by the legislature that a person making the mere bald statement to the county that X is the guilty man, and a county officer making the mere actual arrest should be entitled to the reward (though perhaps they might be entitled to some share therein) where other persons had been the real effective cause—had done the actual work of discovery and detection and providing for the actual arrest.

The persons who have been the substantial and effective means or cause of the detection and apprehension by the county are the persons who earn the reward. Such is the natural interpretation to be placed on the statute. It accords with the language of the supreme court in *Furman* v. *Parke, supra,* where the reward was offered (by private persons) *"for the apprehension and conviction"* of certain criminals, and the court says (at *p. 315*): "Admitting that by a fair construction of the contract, the reward is to be paid to the person who gives the requisite information, or who is the moving cause,

or the effective instrument of the apprehension and conviction," &c.

Moreover, it is the interpretation necessarily to be placed upon the statute as it seems to me from the following considerations.

The statute authorizes a reward to be offered only for "detection *and* apprehension." It may not be offered for detection or apprehension alone (such an offer if made would presumably be *ultra vires* and invalid), and the reason is plain in the case of a criminal of unknown identity. In such a case it is of importance to the county not only that the guilty man be in fact apprehended, but that there be discovery or *prima facie* proof that the man in custody is the criminal. Hence the two together are specified as the consideration to be obtained by the county and an offer for either alone would be an offer or attempt to make a contract for a less consideration than that specified by the legislature.

The same reasoning does not apply in a case where the identity of the criminal is known. In such a case "detection" can refer only to discovery of his whereabouts. Yet discovery of his whereabouts, as distinguished from, and in addition to, his apprehension, is a matter of no importance from the standpoint of the consideration to be received by the county. If and when the county obtains his apprehension, it has thereby also obtained discovery of his whereabouts. This is obvious, and must have been contemplated by the legislature.

It will not seriously be contended, I think, that the legislature meant to restrict the offer of rewards to those cases only in which the identity of the criminal is unknown. Such a conclusion would not accord with the purpose of the legislature and the public policy involved. It is, and was, a fact necessarily contemplated by the legislature that as many (if not more) cases arise of known identity as of unknown identity in which the offer of reward is necessary or advisable in order to secure the general legislative object—namely, the certain and speedy punishment of crime.

Yet the statute makes no distinction between the two classes of cases. In all cases the reward is to be for detection and

apprehension. The word "detection" was not used meaninglessly or without reason. Prior to the passage of this act there was already legislation authorizing rewards to be offered by the governor (*Criminal Procedure act, P. L. 1898 § 29 p. 876*), and that act specifies "apprehension" alone (or "apprehension and securing") as the consideration for which the reward is to be offered.

The only rational explanation which I can ascribe to the fact that the statute refers to detection conjunctively with apprehension as the consideration in all cases, including those of known identity of the criminal as well as those of unknown identity, is that the legislature had the matter in mind from the standpoint of both sides to the contract—it contemplated not only the consideration to be received by the county, but also the persons who might perform and become entitled to the reward. A supposititious case, which might frequently arise in fact, will illustrate: Reward offered, in the language of the statute, for X, a criminal of known identity. A discovers X's whereabouts and arranges for his arrest by the county. While A and the officer are approaching X starts to flee, but B, happening to be near by, pursues and captures him and takes him back to the officer. B has accomplished the apprehension, but A accomplished the discovery of the whereabouts, and "but for" his so doing the particular apprehension which was accomplished would not have taken place. The legislature meant that in such case B should not get the entire reward but that A and B should receive it.

So, as stated at the commencement of this discussion, in my view the statute not only naturally but necessarily is to be interpreted as intending that the persons who shall be entitled to the reward are those who have been the effective cause of the detection and apprehension—not those, or at least not only those, who give the bare information to the county and who do the bare taking into custody.

And similar interpretation is also to be placed, as I have heretofore shown, upon similar or analogous language or provision in the resolution or offer, in the absence of clear contra-indications.

It is evident, however, that there is, in form and wording at least, a marked difference between the offer in the resolution and an offer in the language of the statute. The latter is an offer to buy a certain result and to pay therefor to the persons effecting such result, without limitation upon the means or method by which the result is accomplished. The former is an offer to buy information and to pay therefor (by necessary inference) to the persons giving the information. True, that information must be information which "leads to" or (in fair paraphrase) "shall be the effective cause of" the same result (so far as "detection" and "apprehension" are concerned) as the result which the statutory form offers to buy. The resolution might fairly and properly be construed therefore as an offer to buy that result, if and when—but only if and when—accomplished by means of information given to the county. A statute of this kind is to receive a liberal construction toward the furtherance of the legislative purpose, and so also should a resolution of this kind.

But there are limits which even the most liberal construction cannot pass. I cannot escape the conclusion that the difference between the offer in the statutory form and the offer in the resolution is vital and essential, and that the resulting contracts in each case are markedly and distinctly different. The difference lies in the performance, and the *importance* of the difference lies in the determination of the person or persons who have performed—with whom has the contract in fact been made, and who is entitled to payment?

To illustrate by a simple case: Suppose an offer seeking the detection and apprehension of X, a criminal of known identity. A by clever detective work discovers his whereabouts, which are outside the state, and devises a plan to get him into the state, intending to cause his arrest. The plan works and X comes, but comes earlier than A anticipated and before A has arranged the capture or given any information to the county authorities, B accidentally sees and recognizes X, telephones the authorities and causes his arrest. If the offer of the reward were in the statutory form, clearly the

performance would be by A and B both, for the acts of each are independent effective causes together actually ending in the result stipulated for. The resultant contract would be with the two, severally, and they together would be entitled to payment (though not necessarily in equal shares). But if the offer were in the form of the present resolution, B alone would be entitled to payment, for the contract would be with him alone, since he alone performed the stipulated thing of giving the required information—or putting it in the other way, he alone accomplished the stipulated result in the stipulated manner by giving information to the county.

Naturally, such a result would not commend itself to a court of equity as desirable, since "morally" A should be entitled to share. But if that case were before this court on interpleader the reward would have to be decreed to B. The question would be one solely of legal rights—have either A or B or both any legal right to the reward—and would needs be determined upon the principles applicable to legal rights. No circumstances are present justifying the application of any equitable principles to modify the legal rights.

There is another difference between the resolution and the statutory form of offer, and that is that the former adds "conviction" as a necessary part of the performance.

The question occurs, in view of these differences, does the resolution come within the authorization of the statute? If it does not then I take it it would be unauthorized and invalid and none of the claimants would be entitled to payment, notwithstanding the county's admission that the money is due to some one or more of them. Let us assume, however, that the resolution is valid and consider the fabric of causation in the case at bar—it is not a single chain, but a combination of several chains.

The possible several elements of the causation of the detection and apprehension by the county, as disclosed by the evidence, might be specified as follows:

1. Information that the persons perpetrating the offences were three in number and that one of them was tall and one was short.

2. Grippo's investigations and discoveries as to the three Krebs brothers.

3. Grippo's communication of this information to Vardalis.

4. Grippo's communication of this information to Galatian.

5. Schmidlin's wounding of one of the perpetrators of the new holdup.

6. Schmidlin's informing Galatian of the new holdup.

7. Schmidlin's informing Murphy of the new holdup and of the wounding of one of the criminals. (This led to Murphy coming out, and it was Murphy who discovered the blood trail on the second search.)

8. Smith and Lee telephoning to Hopkins of the new holdup (thereby causing Hopkins to come out and join in the hunt. It was Hopkins who started the second search and who suggested seeing Vardalis).

9. Schmidlin, Hopkins and Murphy following the trail of blood to the haystacks (leading to the subsequent determination of Hopkins to endeavor to pick up such trail).

10. The second search by Hopkins and Murphy and the discovery of the blood trail leading in the direction of Kenilworth, and their determination to see Vardalis.

11. Communication to Vardalis by Hopkins and Murphy of the information as to the new holdup, the wounding of one of the criminals and the following the blood trail toward Kenilworth.

12. Communication of information by Vardalis to Hopkins and Murphy as to the Krebs' house and the suspicion against its occupants.

13. The visit of Vardalis, Hopkins and Murphy to the Krebs' house and the discovery and capture of the three bandits.

14. Transporting the bandits to and incarcerating them in the Kenilworth police station.

15. Grippo informing Galatian of the new holdup.

16. Communication to the county authorities of information identifying the three captives as the perpetrators of the crimes mentioned in the offer of reward.

Of these items 1 and 2 must be at once discarded, since they occurred prior to the offer of reward, and hence could not be performance of the thing for which the reward was offered, nor performance in consideration of the offer. It is evident that it was for this reason, *inter alia* at least, that the claimant Rubenstein defaulted at the hearing, since his statement of claim shows his claim to have been based upon the fact that he communicated information to Grippo, but that such communication was some days prior to the offer of reward.

In view of the form and meaning of the offer as made in the resolution, items 5, 9, 10, 13 and 14 must also be discarded, since they are the doing of acts, not the giving of information.

Items 3, 7, 8, 11 and 12 are each the giving of information, but none of them is a giving of information to the county or to any one authorized to receive information on behalf of the county, nor to any one for the purpose of being communicated to the county and actually so communicated. The offer, of course, by necessary implication, means that the information is to be given to the county or its authorized agents. The advertisement specifies Galatian and the prosecutor. This is not a special authorization, for the advertisement was not the offer and was not itself the act of the board of freeholders; but doubtless, Galatian, as chief of county detectives, and the prosecutor, would each have implied authority to receive the information. It would not be necessary to give the information to the board itself, though, of course, such communication would be effective.

This leaves 4, 6, 15 and 16 as the only possible items which can be considered as constituting performance of the contract.

As to item 4—in the first place I am unable to perceive that Grippo has borne the burden of proof of establishing that his giving this information to Galatian was the effective cause, or an effective cause, of the detection and arrest. Obviously, as to his own claim, each interpleading claimant is a complainant and has the burden of proof. Assuming that Grippo gave this information to Galatian *after* the

reward was offered and not before, and notwithstanding the
testimony that it was arranged by Galatian, as a result of
this information, that Vardalis should be notified of the
occurrence of the next holdup and should immediately go to
the vicinity of the Krebs' house to detect, if possible, the
bandits in the act of returning thereto, nevertheless that plan
was not followed out—the circumstances that actually hap-
pened were different. The holdup of February 25th occurred
about midnight. Vardalis was not notified of it until he
learned of it from Hopkins and Murphy at four-thirty A. M.
Possibly if he had *then* gone immediately to the vicinity of
the Krebs' house he might have seen the bandits returning
to the house. But he did not go there until about six-thirty,
and then, according to the testimony of Hopkins and Murphy,
not of his own volition and initiative, but on the volition and
initiative of Hopkins. The testimony of Hopkins and
Murphy is entitled to at least equal weight with the testimony
of Vardalis and Grippo in contradiction on this point. In-
deed, the weight is rather with the former two, because of
Vardalis' delay of two hours—delay for which Vardalis, on
his own testimony, was himself alone responsible.

It is true that except for the information they obtained
from Vardalis, Hopkins and Murphy would not, and could
not, have gone to the Krebs' House. But it is far from being
proven that Grippo's information to Galatian caused, or led
to, the giving of the information to Hopkins and Murphy by
Vardalis. By the testimony of Vardalis and Grippo them-
selves, Grippo had given to Vardalis the information about
the Krebs, before February 17th, and also to Mayor Nitschke,
and had given to Vardalis a John Doe warrant to use on the
Krebs brothers, and Mayor Nitschke had directed Vardalis
to watch the Krebs' house before February 17th. There is at
least equally as much reason to conclude that all this, or
some of it, caused or led to Vardalis' information to Hopkins
and Murphy, as that Galatian caused it.

In the second place Grippo has not borne the burden of
proof in establishing that he gave the information to Galatian
after and not before the offer of reward. In fact I am

satisfied that he did give it before the offer of reward. The detailed explanation of the facts and reasoning necessitating this conclusion is unfortunately, but inevitably, so voluminous that I have excised it from this opinion.

As to items 6 and 15—it seems sufficiently proven that Schmidlin called Galatian's telephone and informed the person at the other end (who said he was Galatian and whom Schmidlin seems to have been, at the time, justified in believing to be Galatian) of the fact of the new holdup. Galatian says it was not he to whom Schmidlin talked, and that he knew nothing of the new holdup until about seven A. M., when he was told by Grippo over the telephone. But whether Galatian first obtained that information from Schmidlin or from Grippo (and Grippo told him nothing more, except that the officers had left his house to go to the Krebs' house, to see what they might discover) is in itself of no moment; for the evidence is barren of anything to support the idea that the information, or the giving thereof, substantially led to, or was an effective cause of, the detection or apprehension of the criminals.

Now, as to the last item, No. 16. Presumably some one communicated to the county authorities information sufficient to satisfy them that the three captives were the ones guilty of the prior crimes, and if so that might be deemed information leading to the detection by the county. Perhaps information satisfying the county authorities that the three were guilty of this latest crime was sufficient to satisfy them that they were guilty of the prior crimes (in respect of which the reward was offered). The difficulty is, however, that the evidence does not show by whom any such information was conveyed, nor even in fact that any such information was given.

It appears that Galatian learned from Grippo, about seven A. M. on the twenty-sixth, that the Krebs had been arrested—but that was not identification of them as the criminals. It appears that there was a conference at which Galatian and all the claimants (except Lee and Smith) were present, on February 27th; but (omitting the question as to the validity

of completing a contract on Sunday), it does not in fact appear that anybody gave Galatian any information then, and it appears by the bill (tacitly admitted by all the parties) that Galatian had made sworn complaints against the captives for all the crimes, on the twenty-sixth; so that he must have on that day been sufficiently informed as to their guilt.

There remains also the matter of "conviction." Under the offer, to make the contract complete, there must have been information given leading to the detection, apprehension *and conviction*. It appears by the allegations of the bill (tacitly admitted by all claimants) that the three captives were in fact convicted of all the offenses referred to in the offer, such convictions being by way of signing "allegations" and pleading guilty, and being sentenced, on each of the complaints heretofore mentioned—all this being done on February 28th. But it does not appear what led the criminals to this action; it does not appear that there was not some other information given to the county which was the effective cause thereof. So that both on principle, and under the express decision in *Furman* v. *Parke, supra,* this is a deficiency in the proofs which is fatal to the claims of all the interpleaders. *Cf.* also *Codding* v. *Mansfield, 73 Mass. 272.* I do not mean by that that no claimant could recover unless he showed that the information he gave to the county caused the detection, arrest and conviction—all three—but that none of the claimants can recover unless it be shown, at least, that information given by some of the claimants, severally or jointly, caused the entire stipulated result of detection, arrest and conviction. In other words, it must be proved that the contract was in fact completed according to the terms of the offer, whether by the single or several or joint action of one or more persons, and that if more than one person participated in the performance, all who did so participate must be parties in the suit, since the contract is entire, and though entire performance might be by the totality of the acts of several acting independently, no one of them alone could sue for or recover a part of the reward. Payment can be earned only as a whole and awarded only as a whole; although when so awarded dis-

tribution might be made severally, *Fargo* v. *Arthur, 43 How. Pr. (N. Y.) 193.*

The conclusion therefore is that none of the claimants has established a right to the reward or to any part thereof. None of the claimants has established that he performed the contract, nor that the contract was performed and that he performed part. The moneys involved (and paid into court) are public moneys and must be repaid to the county.

I have sought earnestly, but in vain, for some escape from this result, which cannot be contemplated with pleasure or satisfaction by a court of equity, under the circumstances of the case. Morally speaking, the reward was earned; the county obtained that which was essentially the thing it sought —the detection, arrest and conviction of the offenders—and some, at least, of these claimants were instrumental in accomplishing this, though not in the manner prescribed by the county. In all probability the county had no reason for making the offer as it did, in terms differing from the statute, and indeed probably did not realize that it was making such variance, or at least that the variance might result in depriving persons substantially causing the detection and apprehension of the reward or any share therein. The county made no refusal to pay, but admitted that some or all of the claimants were entitled, and went as far as it could go, by paying the money into court. Under all these circumstances it may be difficult for the claimants or the public satisfactorily to comprehend the result, although, after all it rests upon the principle, universally known and understood, that a contract must be performed according to its terms, by one intending to claim thereunder.

Although the county makes no defence and is willing and anxious to pay, the claimants do defend against payment to each other, and payment cannot be made unless and until it is determined who is entitled to receive payment. Each claimant (or set of claimants) says that each of the others did not perform the offer and become legally entitled to the reward. There is a separate issue as to each claimant—did he or did he not substantially perform the contract? The mere de-

termination as to any or each particular claimant, that he did not perform, does not prove that any of the others did. No one claimant can say, "it is proved that the other claimants are not entitled, hence the reward should be given to me, inasmuch as the county is willing to pay." Each of the other claimants would have just as much right to make the same contention as to himself.

The propriety and advisability of framing these offers of reward in the statutory words is sufficiently indicated.

The county having been, in some part at least, responsible for the difficulty and the litigation, I am inclined to think that the costs of all the claimants should be paid out of the fund, and I will also entertain an application for counsel fees, of which application, however, the county shall be given notice.